CASE NO. 17-1071

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

NAZLI MCDONNELL and ERIC VERLO,

Plaintiffs-Appellees,

v.

CITY AND COUNTY OF DENVER,
DENVER POLICE COMMANDER ANTONIO LOPEZ, in his individual and
official capacity, and
DENVER POLICE SERGEANT VIRGINIA QUINONES, in her individual and
official capacity,

Defendants-Appellants

_____

On Appeal from the United States District Court for the District of Colorado
The Honorable William J. Martinez
District Court No. 17-cv-00332-WJM-MJW
_____

## PLAINTIFFS – APPELLEES' RESPONSE BRIEF
_____

David A. Lane
Mari Newman
Andrew McNulty
Killmer, Lane & Newman, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
Phone: 303-571-1000
Fax: 303-571-1000
dlane@kln-law.com
mnewman@kln-law.com
amcnulty@kln-law.com

**ORAL ARGUMENT IS REQUESTED**

# TABLE OF CONTENTS

1. **Statement of Related Cases**...................................................................1

2. **Jurisdictional Statement**.....................................................................1

3. **Issues Presented for Review**…………………….…………….…………1

4. **Statement of the Case**…………………………………….………….…...1
   4.1 Statement of Facts…………………………………………..………1
   4.2 Procedural Posture…………………………………..……....6

5. **Summary of the Argument**………………...………………….………..9

6. **Argument**…………………..………………………….………...11
   6.1 The standard of review applicable to this Court's review of the District
       Court's Order…...............………………………………………11
   6.2 The District Court properly analyzed Regulation 50 under the
       reasonableness standard applied to restrictions on speech at nonpublic
       fora…………………………...............................………………...12
       6.2(a) *The District Court properly weighed and considered that
              Regulation 50 completely prohibited spontaneous
              expression*…………………….......…………………....15
       6.2(b) *The District Court properly considered the significance of the
              intended audience of Plaintiffs-Appellees' speech when
              determining the reasonableness of Regulation
              50*…………………………………….…..……………23
       6.2(c) *The District Court properly determined the practicability of
              shortening Regulation 50's advance notice requirement when
              determining the reasonableness of Regulation
              50*……....………………………………………….25
       6.2(d) *Defendants-Appellants do not have an informal policy of
              expediting
              permits*…………......………………….................…….29
       6.2(e) *The District Court appropriately decided that it is reasonable
              for Regulation 50 to accommodate an applicant's preferred
              demonstration location*…………………………….....30

    6.3   The District Courtrightly concluded that the remaining elements necessary for the issuance of a preliminary injunction weighed in Plaintiff's favor……………………………………………………………….…36

          6.3(a)   *The District Court unerringly adjudged that Plaintiffs-Appellees are irreparably harmed absent an injunction*…...........……………………………………..……….36

          6.3(b)   *The District Court properly weighed Plaintiff's-Appellees' interests against Defendants'*………………………….…..…39

          6.3(c)   *The District Court correctly determined that the public interest is served by protecting First Amendment rights*………………….......…………………………....…42

    6.4   The District Court properly exercised its discretion by narrowly construing Regulation 50...................................................................46

    6.5   The District Court only addressed issues raised by Plaintiffs-Appellees in their Complaint and Motion for Preliminary Injunction…………………………….......………………………48

          6.5(a)   *The District Court rightly determined that Regulation 50.09 is unreasonable*………...………………………………………..50

          6.5(b)   *The District Court rightly determined that Regulation 50.08-12 is unreasonable*……………………………….......…53

7.  **Conclusion**………………………….……………………………….……54

8.  **Statement Regarding Oral Argument**…………..……………....…………55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

CERTIFICATE OF DIGITAL SUBMISSION

# TABLE OF AUTHORITIES

1. **Cases**

*ACLU v. Johnson,*
194 F.3d 1149 (10th Cir. 1999)………………………...…………………………..39, 42

*AG of Okla. V. Tyson Foods, Inc.,*
565 F.3d 769 (10th Cir. 2009)…………………………………...………..……11

*Awad v. Ziriax,*
670 F.3d 1111 (10th Cir. 2012)………………………….……….……...37, 39, 42, 43

*Bd. Of Airport Comm'rs v. Jews for Jesus,*
482 U.S. 569 (1987)…………………………………………...……….26, 33, 50, 54

*Brockett v. Spokan Arcades,*
472 U.S. 491 (1985)……………………………………………………………47

*Brown v. Board of Education of Topeka,*
347 U.S. 483 (1954)……………………………………………………………48

*Buckley v. Valeo,*
424 U.S. 1 (1976)…………………………………………...…………………47

*Carroll v. Commissioners of Princess Anne,*
393 U.S. 175 (1968)……………………………………………………...17, 19, 22

*Cate v. Oldham,*
707 F.2d 1176 (10th Cir. 1983)……………………………....………………..43

*Chicago Area Military Project v. City of Chicago,*
508 F.2d 921 (7th Cir. 1975)……………………………….…………...…………..14

Cmty. For Creative Non-Violence v. Turner,
714 F. Supp. 29 (D.D.C. 1989), .........................…………………………….………17

*Cohen v. California,*
403 U.S. 15 (1971)……………………………………………….……34, 50, 51

iii

*Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.,*
473 U.S. 789 (1984)………………………………….……..……..13, 14, 19

*Dombrowski v. Pfister,*
380 U.S. 479 (1965)………………………………………………………47

*Edwards v. City of Coeur D'Alene,*
262 F.3d 856 (9th Cir. 2001)..………….…………………………..23, 34

*Elrod v. Burns,*
427 U.S. 347 (1976)…………………………….………………………36, 37

*Fernandes v. Limmer,*
663 F.2d 619 (5th Cir. 1981)……………….……………………...……14, 23, 24

*First Unitarian Church of Salt Lake City v. Salt Lake City Corp.,*
308 F.3d 1114 (10th Cir. 2002)……………………...…………………...……..48

*Frymire v. Ampex Corp.,*
61 F.3d 757 (10th Cir. 1995)……………….…………..……………..12, 22

*Grossman v. City of Portland,*
33 F.3d 1200 (9th Cir. 1993)…………………..…………………...…………...……...17

*Hawkins v. City & Cnty. Of Denver,*
170 F.3d 1281 (10th Cir. 1999)………………...…....................................passim

*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,*
452 U.S. 640 (1981)…………………………………………………………23

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston,*
515 U.S. 557 (1995)…………………………………………………………34

*Int'l Soc'y for Krishna Consciousness v. Lee,*
505 U.S. 672 (1992)………...............................................................passim

*Int'l Soc'y for Krishna Consciousness of Missouri, Inc. v. City of St. Louis,*
890 S.W.2d 660 (Mo. Ct. App. 1994)……………….………………..……….21

*ISKCON Miami, Inc. v. Metropolitan Dade County,*

147 F.3d 1282 (11th Cir. 1998)……………………....…………………………..33

*Jews for Jesus v. Mass. Bay Transp. Auth.,*
984 F.2d 1319 (1st Cir. 1993)……………...……….………………………27, 46

*Jews for Jesus, Inc. v. Port of Portland,*
No. CV-04-695-HU, 2005 U.S. Dist. LEXIS 49840 (D. Or. May 5, 2005)
………………………………………………………………………….……...20, 21

*Kiowa Indian Tribe of Okla v. Hoover,*
150 F.3d 1163 (10th Cir. 1998)……………………...……………….....……...12

*Korematsu v. United States,*
323 U.S. 214 (1944)…………………………………………………………38

*Marbury v. Madison,*
5 U.S. 137 (1803)………………………………………...……………………48

*Marcavage v. City of Chicago,*
659 F.3d 626 (7th Cir. 2011)…………………………………………………..21

*McCullen v. Coakley,*
134 S.Ct. 2518 (2014)…………………………………………………..…23, 34

*Multimedia Publ'g Co. v. Greenwille-Spartangburg Airport Dist.,*
991 F.2d 154 (4th Cir. 1993)……………………….…………….…………….26

*Pac. Frontier v. Pleasant Grove City,*
414 F.3d 1221 (10th Cir. 2005)………………...……….…..………………..43

*Pahls v. Thomas,*
718 F.3d 1210 (10th Cir. 2013)…………………….…...…………………..30

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
406 U.S. 37 (1983)………………………………………………………26, 27

*Phelps-Roper v. City of Manchester, Mo.,*
697 F.3d 678 (8th Cir. 2012)…………………...……….…….....…………..39

*Phelps-Roper v. Nixon,*

545 F.3d 685 (8th Cir. 2008)…………………...…………………...………………39

*Riley v. Nat'l Fed'n of the Blind*,
487 U.S. 781 (1988)………………………………………….....………………..34

*RoDa Drilling Co. v. Siegal*,
552 F.3d 1203 (10th Cir. 2009)………………...……………….…………..12

*Rosen v. Port of Portland*,
641 F.2d 1243 (9th Cir. 1981)………………………...…………...……...14

*Sammartano v. First Judicial Dist. Court*,
303 F.3d 959 (9th Cir. 2002)……………….…………...……………………37

*Sanders v. Mountain Am. Credit Union*,
621 F. App'x 520 (10th Cir. 2015)………………….....……….…………42

*Santa Monica Food Not Bombs v. City of Santa Monica*,
450 F.3d 1022 (9th Cir. 2006)……………….…...……………...……………17

*Schneider v. New Jersey*,
308 U.S. 147 (1939)………………….………………………………23, 34

*Shuttlesworth v. Birmingham*,
394 U.S. 147 (1969)…………………….…………….………..17, 19, 22

*Springfield v. San Diego Unified Port Dist.*,
950 F. Sup. 1482 (S.D. Cal. 1996)…………………………………..33, 51, 52

*Stanton v. Fort-Wayne-Allen Cty.*,
834 F. Supp. 2d 865 (N.D. Ind. 2011)……………………………….………33

*S.W. Africa/Namibia Trade & Cult. Coun. V. U.S.*,
708 F.2d 760 (D.C. Cir. 1983)…………….……………………....…………14

*Tobey v. Jones*,
706 F.3d 379 (4th Cir. 2013)…………...…….……………….11, 46, 51

*United States v. Grace*,
461 U.S. 171 (1983)………………….……………………………47

*United States v. Kokinda,*
4979 U.S. 720 (1990)……………….…………………………………………………….53

*Valle Del sol Inc. v. Whiting,*
709 F.3d 808 (9th Cir. 2013)……………..…………..…………….…...…………….45

*Verlo v. Martinez,*
820 F.3d 1113 (10th Cir. 2016)…………….…..............……...………………37, 39

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. Of Stratton,*
536 U.S. 150 (2002)……………………………………….…..………16, 17, 19, 22

*Wickersham v. City of Columbia,*
371 F. Supp. 2d 1061 (W.D. Mo. 2005)…………..…………….………………….38

*Winnebago Tribe of Neb. V. Stovall,*
341 F.3d 1202 (10th Cir. 2003)……………….……….….……………..11, 12

## 2.  Other Authority

C. Norwood, *A Twitter Tribute to Holocaust Victims,*
THE ATLANTIC (January 27, 2017)....…………………………………………38

Donald Trump (@real Donald Trump), Twitter…………………...………………...16

1. **Statement of Related Cases**

There are no prior or related appeals in this matter.

2. **Jurisdictional Statement**

Appellees agree with Appellant's statement of jurisdiction to the extent it states that this Court has jurisdiction over the issues raised on appeal.

3. **Issues Presented For Review**

3.1 Whether the district court erred when it utilized the reasonableness standard outlined in *Hawkins v. City & Cnty. of Denver*, 170 F.3d 1281 (10th Cir. 1999) and *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672 (1992) when assessing the constitutionality of Regulation 50.

3.2 Whether the district court erred when it determined that the remaining elements necessary for the issuance of a preliminary injunction weighed in Plaintiffs-Appellees' favor.

3.3 Whether the district court erred when it applied a limiting construction to certain provisions of Regulation 50.

4. **Statement of the Case**

4.1 <u>Statement of Facts</u>

This case arises from a two-day protest at Denver International Airport (hereinafter "DIA") on January 28, 2017 and January 29, 2017. Plaintiffs-Appellees traveled to DIA on January 29, 2017, to protest President Donald

Trump's Original Executive Order (hereinafter "Travel Ban"), which permanently banned Syrian refugees from emigrating to the United States, temporarily banned nationals of seven countries (including permanent legal residents and visa-holders), and suspended all applications to the United States refugee program (even as to vetted entrants currently in transit). Aplt. Appx., p. 175-76. Plaintiffs-Appellees did so in a public area outside of the secure Customs and Border Protection (hereinafter "CBP") screening area within Jeppesen Terminal (the main terminal at DIA, which is open to the public). *Id*. While silently displaying their signs, Plaintiffs-Appellees were positioned significantly behind the railing, which demarcates where those waiting for international arrivals are permitted to stand. Plaintiffs-Appellees did not impede the right of way of any passengers. *Id.*, pp. 177-78. They did not engage in any activity that could be construed as impacting security within DIA. *Id.* They simply stood silently with placards showing their distaste for the Travel Ban and the man who executed it. *Id.*, pp. 474, 477, 483.

Even though Plaintiffs-Appellees were simply engaged in peaceful First Amendment protected expression, they were threatened with arrest. *Id.*, p. 179. Defendant-Appellant Virginia Quinones, a sergeant with the Denver Police Department, informed Plaintiffs-Appellees that, in order to stand silently with political signs, they would need a permit. *Id.* Without a permit, Sergeant Quinones stated, all "First Amendment expression" at DIA was banned. *Id.*

Plaintiffs-Appellees protest on January 29, 2017, was not the first time since the enactment of the Travel Ban that the Denver Police Department threatened individuals with arrest for engaging in First Amendment protected activity within Jeppesen Terminal. On January 28, 2017, a protest was held in the plaza of Jeppesen Terminal. Aplt. Appx., p. 253-262. During the protest, Defendant-Appellant Antonio Lopez, a Commander with the Denver Police Department, instructed multiple individuals, including State Representative Joseph Salazar and representatives from the ACLU of Colorado, that all "First Amendment expression" was banned at DIA without a permit; Commander Lopez threatened the entire group of protesters with arrest if they did not immediately leave DIA. Aplt. Appx., pp. 271, 272-275, 471. The protesters had, in fact, attempted to apply for a permit earlier that day. Aplt. Appx., pp. 259-261, 271, 511-512. However, it had not been granted because they had not done so seven days in advance of the protest, in compliance with DIA regulations. *Id.* Representative Salazar also attempted to apply for a permit, and asked that it be granted on an expedited basis. Aplt. Appx., p. 275-77. Representative Salazar's request was denied by DIA officials and a Denver City Attorney. *Id.*

By all accounts the protest on January 28, 2017, was completely peaceful. Aplt. Appx. 261. No one engaged in, or was arrested for engaging in, criminal behavior. Aplt. Appx. 274-275. And, importantly, no passenger was obstructed or

missed their flight because of the protest. Aplt. Appx., pp. 198, 261-62, 270-271, 287-288

The DIA regulation that both Sergeant Quinones and Commander Lopez relied upon in instructing Plaintiffs, and others, that Denver International Airport banned all "First Amendment expression" without a permit is DENVER INTERNATIONAL AIRPORT REGULATION 50 (hereinafter "Regulation 50"). Aplt. Appx., pp. 492-499. Regulation 50.03 states, in relevant part, that:

> no person or organization shall leaflet, conduct surveys, display signs, gather signatures, solicit funds, or engage in other speech related activity at Denver International Airport for religious, charitable, or political purposes, or in connection with a labor dispute, except pursuant to, and in compliance with, a permit for such activity issued by the CEO or his or her designee.

There is no further definition for the phrase "other speech related activity" in Regulation 50. *Id.* Charitable is defined in Regulation 50.02-2. as "mean[ing] and include[ing] the words patriotic, philanthropic, social service, health, welfare, benevolent, educational, civic, cultural or fraternal, either actual or purported." *Id*. Political is defined in Regulation 50.02-9 as "mean[ing] and includ[ing] activities related to the right to vote or attempts to influence or protest the outcome of any election or nomination campaigns, legislations, petitions, referenda or other measures to be submitted to the citizens for vote." *Id*.

In order to obtain a permit, pursuant to Regulation 50.04-1, an individual *must* "complete a permit application and submit it during regular business hours, at

least seven (7) days prior to the commencement of the activity for which the permit is sought[.]" *Id.* Regulation 50.04-1 requires applicants to specify "each location at which the [expressive] activity is proposed to be conducted," however, it does not place any limitation on the Airport's discretion to approve the location request. *Id.* Regulation 50.04-6 restrains Defendants-Appellants discretion in determining the location of a demonstration that is already underway, stating "[t]he CEO may move expressive activity from one location to another and/or disperse such activity around the airport upon reasonable notice to each affected person when in the judgement of the CEO such action is necessary for the efficient and effective operation of the transportation function of the airport." *Id.*

Additionally, Regulation 50.09 states, regardless of whether an individual obtains a permit, that "[p]icketing not related to a labor dispute is prohibited in all interior areas of the Terminal and concourse, in the Restricted Area, and on all vehicular roadways, and shall not be conducted by more than two (2) persons at any one location upon the Airport." *Id*. Picketing is defined in Regulation 50.02-8 as "one or more persons marching or stationing themselves in an area in order to communicate their position on a political, charitable, or religious issue, or a labor dispute, by displaying one or more signs, posters or similar devices." *Id*. Another portion of Regulation 50, Regulation 50.08-12, prohibits signs of larger than one

foot by one foot to be displayed in the areas where picketing is not prohibited; namely, outside of Jeppesen Terminal. *Id.*

### 4.2 Procedural Posture

Almost immediately following their threatened arrest, Plaintiffs-Appellees filed a Complaint and Motion for Preliminary Injunction challenging the actions of Defendants-Appellants, and the entirety of Regulation 50, as unconstitutional. *Id.*, pp. 9-45. On February 15, 2017, the District Court held a full-day hearing, during which both sides were given equal time to present evidence to support their positions. *Id.*, pp. 162-463.

During the Preliminary Injunction Hearing, Plaintiffs-Appellees testified that they had traveled to DIA to express their message of solidarity with those affected by the Travel Ban, and defiance to President Trump, directly to international travelers and their families, many of whom had been affected by the Travel Ban. *Id.*, pp. 177, 223. The testimony that DIA was the only forum in which Plaintiffs-Appellees could reach this audience was unrebutted. *Id.* Plaintiffs-Appellees, and the attendees of the January 28, 2017, protest, also testified that it was important that they express their message of solidarity and defiance at the airport immediately after the implementation of the Travel Ban because it was necessary to promptly show that large swaths of the American people did not support the Travel Ban. *Id.*, pp. 177, 256  They also testified travelers were currently being

detained and it was important to show solidarity to their loved ones who were nervously waiting at DIA. *Id.*

None of Defendants-Appellants' witnesses testified during the hearing that Plaintiffs-Appellees, and others who protested on both days, had caused one passenger to miss a flight, engaged in any unlawful activity (other than violating Regulation 50 by not acquiring a permit prior to engaging in First Amendment activity), nor impeded any passenger's ingress or egress throughout the Terminal. *Id.*, pp. 340, 356. The only testimony they could offer regarding safety and obstruction concerns at DIA in connection with protest was conjecture about potential harms, despite the fact that a large-scale protest involving sound amplification equipment, chanting, singing, and marching had occurred and none of the evils speculated about by the DIA administrators had come to pass.

One of the witnesses who testified on behalf of Defendants-Appellants at the hearing was David Dalton, the individual responsible for enforcement of Regulation 50 and the issuance of permits at Denver International Airport. *Id.*, pp. 368-99. Mr. Dalton testified that, based on his reading of Regulation 50.09 (which states that "[p]icketing not related to a labor dispute is prohibited in all interior areas of the Terminal and concourses, in the Restricted Area, and on all vehicular roadways, and shall not be conducted by more than two (2) persons at any one location upon the Airport") all picketing (which includes, per Regulation 50.09,

"one or more persons marching or stationing themselves in an area in order to communicate their position on a political, charitable, or religious issue, or a labor dispute, by displaying one or more signs, posters or similar devices") within the Jeppesen Terminal is prohibited, regardless of whether an individual obtains a permit. *Id.*, p. 386.

After the hearing, the District Court issued an order partially enjoining Regulation 50. *Id.*, pp. 114-59. The District Court methodically went through the issues presented. *Id.* First, the District Court determined that both Plaintiffs-Appellees' speech was First Amendment protected expression and that DIA was a nonpublic forum. *Id.*, pp. 132-138. The District Court determined that some form of advance permitting requirement was reasonable at DIA under the standard outlined in *Hawkins* and *Lee*, denying Plaintiffs-Appellees request to enjoin Regulation 50's permitting requirement in its entirety. *Id.*, pp. 139-143. The District Court then found that Regulation 50's seven day advance permitting requirement was reasonable. *Id.*, pp. 142-43.

After determining that Defendants-Appellants could constitutionally require a permit application be submitted seven days in advance, the District Court found unreasonable Regulation 50's lack of a formal process for handling permit applications more quickly in exigent circumstances and held that "Plaintiffs are strongly likely to succeed in their challenge to Regulation 50.03 to this limited

extent." *Id.*, pp. 144-47. The District Court also found unreasonable and enjoined the portions of Regulation 50 that gave airport administrators unbridled discretion to determine the location of permitted protests within the Jeppesen Terminal, completely prohibited picketing (with the exception of labor picketing) within the Jeppesen Terminal, and limited the sizes of signs that could be utilized in permitted protests to one foot by one foot. *Id.,* pp. 147-149. Defendants-Appellants appealed the District Court's Order. *Id.*, pp. 160-61.

5. **Summary of the Argument**

The District Court properly exercised its discretion in enjoining discrete portions of Regulation 50. After determining that DIA is a nonpublic forum, the District Court correctly applied the reasonableness standard to Regulation 50's myriad restrictions on free speech. In its analysis, the District Court properly considered the particular nature of Plaintiffs-Appellees expression, that DIA is a multipurpose forum whose stated purpose is the facilitation of air travel, and all the surrounding circumstances. The District Court correctly considered the fact that Plaintiffs-Appellees expression needed to be spontaneous and that it needed to occur at DIA in order for Plaintiffs-Appellees to reach their intended audience. The District Court's consideration of these important First Amendment principles was supported by well-established Supreme and Circuit Court precedent. After considering all of the surrounding circumstances, the District Court concluded,

consistent with the factual record and legal precedent, that Regulation 50's lack of a formal expedited permitting process, grant of unfettered discretion to DIA administrators to determine the location of permitted protests, complete ban of picketing within the Jeppesen Terminal (even with a permit), and limitation of all signs to one foot by one foot were unreasonable, and that Plaintiffs-Appellees were likely to prevail on these few, discrete issues.

After determining that there was a strong likelihood that Plaintiffs-Appellees would be able to prove their First Amendment rights were violated, the District Court correctly found that Plaintiffs-Appellees had demonstrated irreparable harm, that the balance of the harms weighed in Plaintiffs-Appellees favor, and that the public interest was served by the issuance of the limited injunction.

In accordance with these findings, the District Court issued a limited injunction only broad enough to ensure that the unreasonable portions of Regulation 50 were enjoined, Plaintiffs-Appellees First Amendment rights would not continue to be infringed upon, and DIA officials would still be able to ensure the safe and efficient operation of DIA.

This Court has described "the reasonableness test as a factually-intensive, individualized inquiry." *Hawkins*, 170 F.3d at 1289-90. The District Court did its due diligence, analyzing all of the evidence in the record in light of legal precedent (including well-established principles of First Amendment jurisprudence) and

determined that a few of Regulation 50's restrictions of Plaintiffs-Appellees' speech were unreasonable. Defendants-Appellants face a high burden in demonstrating that the District Court abused its discretion. Defendants-Appellants cannot carry that burden.

6. **Argument**

"[I]t is crystal clear that the First Amendment protects peaceful nondisruptive speech in an airport[.]" *Tobey v. Jones*, 706 F.3d 379, 391 (4th Cir. 2013). Plaintiffs-Appellees simply wish to engage in peaceful, nondisruptive speech at DIA by holding signs showing solidarity with those affected by the Travel Ban and their distaste for what they perceive as the xenophobic policies of President Trump in a timely reaction to the implementation of the President's actions. The District Court, correctly, determined that the First Amendment affords Plaintiffs-Appellees' speech protection.

6.1 The standard of review applicable to this Court's review of the District Court's Order.

In this circuit, an appeal of a district court's decision to issue a preliminary injunction is evaluated under the abuse of discretion standard. *See AG of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 775 (10th Cir. 2009). "The standard for abuse of discretion is high. The state must show that the district court committed an error of law (for example, by applying the wrong legal standard) or committed clear error in its factual findings." *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202,

1205 (10th Cir. 2003) (citing *Kiowa Indian Tribe of Okla. v. Hoover*, 150 F.3d 1163, 1165 (10th Cir. 1998)). This Court has previously characterized an abuse of discretion as "'an arbitrary, capricious, whimsical, or manifestly unreasonable judgment.'" *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (quoting *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1205-06 (10th Cir. 2003)). Moreover, this Court "will not disturb a trial court's decision unless that court has made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Frymire v. Ampex Corp*, 61 F.3d 757, 773 (10th Cir. 1995). Defendants-Appellants cannot meet this high burden.

6.2 <u>The District Court properly analyzed Regulation 50 under the reasonableness standard applied to restrictions on speech at nonpublic fora.</u>

Defendants-Appellants contend that the District Court failed to subject Regulation 50 to the reasonableness analysis undertaken in nonpublic fora. This is simply not true. In its opinion, the District Court explicitly analyzed Regulation 50 under the reasonableness standard outlined in *Hawkins* and *Lee*. App. Appx., pp. 139-149.

In *Lee*, Justice O'Connor set forth the test for determining reasonableness in the context of nonpublic fora. 505 U.S. at 687 (O'Connor, J., concurring).[1] She

---

[1] *Lee* involved a plurality opinion, joined by Justice O'Connor. Therefore, Justice O'Connor's concurrence is the "narrowest grounds" that justify the Court's result and her concurrence is binding precedent on this Court. In actuality, this constitutes

stated, "[t]he reasonableness of the Government's restriction [on speech in a nonpublic forum] must be assessed in light of the purpose of the forum and *all the surrounding circumstances*." *Id*. (O'Connor, J., concurring) (quoting *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 789, 809 (1984)) (emphasis added). Justice O'Connor went on to note that airports are a particular type of nonpublic forum, multipurpose facilities, and that this must be taken into account when assessing reasonableness. *Id.* at 688 (O'Connor, J., concurring) (citations omitted) (finding that while "[o]rdinarily . . . we have . . . been confronted with cases where the fora at issue were discrete, single-purpose facilities," airports present a different analysis because they are multipurpose facilities). This led to the determination that, when examining restrictions on speech at airports, "[t]he reasonableness inquiry, therefore, is not whether the restrictions on speech are consistent with preserving the property for air travel, but whether they are reasonably related to maintaining the multipurpose environment that the Port Authority has deliberately created." *Id*. at 689.

---

only *Hawkins*, 170 F.3d at 1289 ("Justice O'Connor's view, who provided the swing vote in the highly-fractured Lee decision, but as the narrowest majority holding, we are bound by it").

The District Court followed this reasonableness standard. After determining that DIA is a nonpublic forum,[2] the District Court noted that "[r]easonableness is a fact-intensive inquiry into the 'particular nature of the public expression' at issue and 'the extent to which it interferes with the designated purposes' of the nonpublic forum. *Id.*, p. 139 (quoting *Hawkins*, 170 F.3d at 1290). The District Court then determined whether Regulation 50's restrictions were "reasonably related to maintaining the multipurpose environment that [DIA] has deliberately created." *Id.*

---

[2] Plaintiffs-Appellees take the position that DIA is a traditional public forum and agree with the analysis contained in Justice Kennedy's concurring opinion in *Lee*. 505 U.S. at 693 (Kennedy, J., concurring) (finding that "the airport corridors and shopping areas outside of the passenger security zones, areas operated by the Port Authority, are public forums, and speech in those places is entitled to protection against all government regulation inconsistent with public forum principles."); *accord Rosen v. Port of Portland*, 641 F.2d 1243, 1247-50 (9th Cir. 1981) (holding that Portland International Airport is a public forum, pre-*Lee*); *S. W. Africa/Namibia Trade & Cult. Coun. v. U.S.*, 708 F.2d 760 (D.C. Cir. 1983) (holding that National and Dulles airports are public forums, pre-*Lee*); *Fernandes v. Limmer*, 663 F.2d 619 (5th Cir. 1981) (holding that Dallas-Fort Worth Airport is a public forum, pre-*Lee*); *Chicago Area Military Project v. City of Chicago*, 508 F.2d 921 (7th Cir. 1975) (holding that O'Hare Airport is a public forum, pre-*Lee*). Even if the Terminal is not a traditional public forum, it is at the very least a designated public forum. *See Cornelius*, 473 U.S. at 802 (stating that a designated public fora is created when the government sets aside public property "for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects."); Regulation 50 (opening the Terminal to speech activity). However, for purposes of this appeal, Plaintiffs-Appellees assume that DIA is a nonpublic forum.

In other words, the District Court faithfully followed the reasonableness standard outlined in Justice O'Connor's concurrence in *Lee* and this Court's opinion in *Hawkins*. Defendants-Appellants arguments to the contrary are without merit.

### 6.2(a) *The District Court properly weighed and considered that Regulation 50 completely prohibited spontaneous expression.*

The District Court did not commit clear legal error by considering that Regulation 50's seven day advance notice permitting requirement completely forecloses spontaneous expression. Under the reasonableness analysis, the District Court was tasked with conducting a fact-intensive inquiry into the "particular nature of the public expression" at issue. *Hawkins*, 170 F.3d at 1290. The District Court was also tasked, pursuant to the reasonableness standard, with assessing Regulation 50 in light of "all the surrounding circumstances." *Lee*, 505 U.S. at 687 (O'Connor, J., concurring); *see also Hawkins*, 170 F.3d at 1289-90 ("Justice O'Connor's opinion in *Lee* describes the reasonableness test as a factually-intensive, individualized inquiry."). The District Court did just that in its Order.

Defendants-Appellants contend that the District Court erred by considering exactly what *Hawkins* charges the District Court with considering: the "particular nature of the public expression" at issue. *Hawkins*, 170 F.3d at 1290. The District Court properly took into account the ample unrebutted testimony at the Preliminary Injunction hearing that Plaintiffs-Appellees speech needed to be expressed in a

timely manner in order to retain its emotive impact and to reach its target audience. Aplt. Appx., p. 256 ([Ms. Newman]: The question I had was why – or whether it was important for you to come immediately to the airport rather than waiting a week or some other period of time? [Nadeen Ibrahim]: It most certainly was very important for us to come that weekend because this – the second [the] executive order was signed, people were being detained at the airport, and these were individuals that already had legal visas and green cards and we found it very important [] to show that we was the American people who did have the privilege of citizenship do stand in solidarity with them and their ability to access the United States); Aplt. Appx., p. 181-82. Plaintiffs-Appellees sought to speak in opposition to President Trump's Travel Ban at the forum the ban would take effect, just as thousands across the nation had done. Under the current administration, the news cycle is measured in minutes – not days.[3] If Plaintiffs-Appellees are required to wait seven days to protest the Travel Ban (or its potential reimplementation), they will miss their moment. Timing is everything. In other words, Plaintiffs-Appellees speech, if it was (and is) to have any effect, needed to be spontaneous and location specific.

Spontaneous expression is well-established in First Amendment jurisprudence as a particular form of expression. *See e.g. Watchtower Bible &*

---

[3] *See* Donald Trump (@realDonaldTrump), Twitter.

*Tract Soc'y of New York, Inc. v. Vill. Of Stratton*, 536 U.S. 150 (2002);

*Shuttlesworth v. Birmingham,* 394 U.S. 147, 163 (1969) ("timing is of the essence

in politics . . . . [W]hen an event occurs, it is often necessary to have one's voice

heard promptly, if it is to be considered at all"); *Carroll v. Commissioners of*

*Princess Anne*, 393 U.S. 175, 182 (1968) (finding that a delay "of even a day or

two" may be intolerable when applied to "political speech in which the element of

timeliness may be important"); *Cmty. for Creative Non-Violence v. Turner*, 714 F.

Supp. 29, 33 (D.D.C. 1989) (holding that a permitting scheme was unconstitutional

in part because the permitting scheme's "built-in delay mechanism…serves to

deter and may even preclude expression necessary to provide an immediate

response to late-breaking events."), *amended,* 729 F. Supp. 869, *aff'd in part, rev'd*

*in part on other grounds,* 893 F.2d 1387 (D.C. Cir. 1990). Courts have found that:

> Advance notice or permitting requirements do, by their very nature,
> foreclose spontaneous expression. Consequently, in any particular
> forum, true spontaneous expression and the application of an advance
> notice requirement are mutually exclusive. Groups *may* be able to
> engage in expressive conduct after the notice period has expired, but
> the change in timing will alter the potential impact of their speech. For
> speech that is truly time sensitive, the precise spontaneous moment
> will be lost.

*Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1046 (9th

Cir. 2006) (emphasis in original) (citations omitted); *see Grossman v. City of*

*Portland*, 33 F.3d 1200, 1206 (9th Cir. 1993) (striking down permitting regulation

in part "because of the delay caused by complying with the permitting procedures, '[i]mmediate speech can no longer respond to immediate issues.'"). The District Court did not err by taking Plaintiffs-Appellees need to express themselves spontaneously, a well-established particular form of expression in First Amendment jurisprudence, into account when determining the reasonableness of Regulation 50's inflexible seven-day waiting period.

Moreover, Justice O'Connor's concurrence in *Lee* charges those undertaking the reasonableness analysis to examine the speech restriction, in this case Regulation 50, in light of *all the surrounding circumstances*. 505 U.S. at 687 (O'Connor, J., concurring). Plaintiffs-Appellees' need to speak immediately, lest they lose their moment, is certainly a circumstance that the District Court should have properly considered in determining the reasonableness of Regulation 50.[4] The District Court also appropriately considered that "this country has never experienced a situation in which (a) the motivation to protest developed so rapidly *and* (b) the most obviously relevant protest locations was a place the Supreme

---

[4] The importance of spontaneous expression was far from the only surrounding circumstance the District Court considered. It also took into account the heightened need for airport security in modern America, Aplt. Appx., p. 140; Defendants-Appellants' interest in efficiency and the fact that DIA serves thousands of passengers per day, *Id.*, p. 140; DIA administrators need to know who is coming to protest, what protest activities they are planning to engage in, the size of the protest, and the security needs of those wishing to express themselves, *Id.*, p. 141; other airports advance notice and permit requirements, *Id.*, pp. 142-43; and Denver's expedited permitting process for street parades, which allows for only twenty-four hours' notice in exigent circumstances, *Id.*, pp. 144-145.

Court had already declared to be a nonpublic forum – the airport terminal." Aplt. Appx., p. 145. Had the District Court not taken all of these surrounding circumstances into account, it would have been legal error in light of binding Supreme Court precedent. This is particularly true given that the Supreme Court has routinely determined that the need for spontaneous expression is a significant consideration in its First Amendment jurisprudence. *See e.g. Watchtower Bible*, 536 U.S. at 150; *Shuttlesworth,* 394 U.S. at 163; *Carroll*, 393 U.S. at 182.

Additionally, while Defendants-Appellants attempt to analogize DIA to other nonpublic forums that have involved "discrete, single-purpose facilities[,]" *see, e.g. Cornelius*, 473 U.S. at 789 (determining that the literature of a charity drive is a nonpublic forum), and rely heavily on these decisions to support their argument that Regulation 50's complete ban on spontaneous expression is reasonable, the District Court correctly recognized that Supreme Court jurisprudence has determined airports to be unique nonpublic fora. App. Appx., p. 145-146. The Supreme Court has held that airports, like DIA, are large, multipurpose facilities. *See Lee*, 505 U.S. at 687 (O'Connor, J., concurring). DIA has granted the public unfettered access to it and "created a huge complex open to travelers and nontravelers alike." *Lee*, 505 U.S. at 688. DIA houses "restaurants, cafeterias, snack bars, coffee shops, cocktail lounges. . . clothing shops . . . food stores. . . currency exchanges, art exhibits, commercial advertising displays,

bookstores, newsstands . . . and private clubs." *Lee*, 505 U.S. at 688; Aplt. Appx.,

p. 330 ( [Mr. McNulty]: There are multiple bars and restaurants outside the

security check point inside of the Jeppesen Terminal, correct? [Kenric Greene]:

Yes. [Mr. McNulty]: There are different shops in there, correct? [Mr. Greene]:

Yes. // [Mr. McNulty]: So the Jeppesen Terminal is a multi-purpose space, right?

[Mr. Greene]: Yes.). Given the unique status of airports as multipurpose fora in the

nonpublic forum reasonableness analysis, it certainly wasn't clear error for the

District Court to simply take the notion that Plaintiffs-Appellees' expression

required spontaneity into account when assessing the reasonableness of Regulation

50's complete prohibition of spontaneous expression.

Defendants-Appellants cite a number of cases in an effort to show that a

seven-day notice period is reasonable. The District Court did not hold that the

seven-day advance permit requirement was unreasonable, making Defendants-

Appellants' argument misplaced. However, if Defendants-Appellants were instead

arguing that the cases cited support the proposition that a seven-day advance

permit requirement without an expedited permitting process that accommodates

spontaneous expression is *per se* reasonable, the cases cited do not support this

proposition. In *Jews for Jesus, Inc. v. Port of Portland*, No. CV-04-695-HU, 2005

U.S. Dist. LEXIS 49840, at *23-26 (D. Or. May 5, 2005), the permit requirement

at issue required (at most) seven days' notice; however, the court made the factual

finding that the administrator in charge of issuing permits "generally issues the permit the same day the permit application is completed." *Id.*, at *4. This certainly informed the court's decision; in practice, anyone applying for a permit received it the same day. In fact, while the court in *Port of Portland* stated that a permit requirement is constitutionally permissible in a nonpublic forum (a conclusion that is wholly consistent with the District Court's Order in this case), the decision involved *no* discussion of the length of the notice requirement, the constitutionality of a seven-day notice requirement, or the concept of spontaneous protest. *See id.*, at *1-38. The other cases cited by Defendants-Appellants also contain *no* discussion of the length of the notice requirement, the constitutionality of a seven-day notice requirement, or the concept of spontaneous protest. *See Int'l Soc'y for Krishna Consciousness of Missouri, Inc. v. City of St. Louis*, 890 S.W.2d 660, 662 (Mo. Ct. App. 1994); *Marcavage v. City of Chicago*, 659 F.3d 626 (7th Cir. 2011). These cases simply do not provide support to Defendants-Appellants position.

The District Court correctly found that there is no "case expressly precluding that consideration when evaluating reasonableness in the context of a nonpublic forum." Aplt. Appx., p. 145. The District Court reached its decision after a review of the case law on both sides and it was not an abuse of discretion for the District Court to make the permissible choice that the need for spontaneous expression is one of the "surrounding circumstances" to consider in making the reasonableness

determination. *Frymire*, 61 F.3d at 773 (finding that the Tenth Circuit "will not disturb a trial court's decision unless that court has . . . exceeded the bounds of permissible choice in the circumstances.").

Finally, Defendants-Appellants in their Opening Brief cite to no case law that states it is erroneous to consider the importance of spontaneous expression in determining the reasonableness of restrictions imposed on speech at a nonpublic forum. Supreme Court precedent definitively states that protection of spontaneous expression, particularly spontaneous political expression of the kind that Plaintiffs-Appellees wish to engage in, is essential to the functioning of a democratic society. *See e.g. Watchtower Bible*, 536 U.S. at 150; *Shuttlesworth,* 394 U.S. at 163; *Carroll*, 393 U.S. at 182. Common sense dictates the special importance of spontaneous expression is not limited to public fora.

The District Court did not commit clear legal error by taking this into consideration when determining the reasonableness of Regulation 50's complete foreclosure of spontaneous expression. Indeed, holding "unreasonable" a notice requirement that completely forecloses spontaneous expression is the legally correct result. The harms of the seven day advance notice requirement in a nonpublic forum are no less pronounced than in a traditional (or designated) public forum. Requiring Plaintiffs-Appellees to give seven days advance notice completely forecloses their protest in violation of the First Amendment.

6.2(b) *The District Court properly considered the significance of the intended audience of Plaintiffs-Appellees' speech when determining the reasonableness of Regulation 50.*

The District Court considered that Plaintiffs-Appellees' speech at the airport was the location where Plaintiffs-Appellees could reach their target audience[5] and correctly factored this particularity of Plaintiffs-Appellees' speech into the reasonableness analysis. The District Court also properly considered it as one of the "surrounding circumstances" it was required to take into account by *Lee*. 505 U.S. at 687 (O'Connor, J., concurring).

It is well-established in First Amendment jurisprudence that speech is only effective if reaches its intended audience. *See McCullen v. Coakley*, 134 S.Ct. 2518, 2535-36 (2014) (holding an abortion clinic buffer zone was not narrowly tailored, in part, because it prevented the plaintiffs from reaching their intended audience); *Schneider v. New Jersey,* 308 U.S. 147, 163 (1939) (invalidating anti-handbilling ordinances even though "their operation is limited to streets and alleys and leaves persons free to distribute printed matter in other public places"); *see also Edwards v. City of Coeur D'Alene*, 262 F.3d 856, 866 (9th Cir. 2001) ("If an ordinance effectively prevents a speaker from reaching his intended audience, it fails to leave open ample alternative means for communication.") (citing *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 654 (1981); *Fernandes*

---

[5] I was also, importantly, the location where their speech would be most effective.

*v. Limmer*, 663 F.2d 619, 635 (5th Cir. 1981)). No Court has held that consideration of this important First Amendment jurisprudential tenet is limited to traditional, or designated, public fora. The District Court certainly cannot be said to have committed clear error by simply considering, among other factors, that Plaintiffs-Appellees could only reach their intended audience by picketing at DIA in its reasonableness analysis.

Moreover, contrary to Defendants-Appellants' assertion that Plaintiffs-Appellees could have reached their intended audience elsewhere, the unrebutted evidence at the Preliminary Injunction hearing established that DIA was the only place for Plaintiffs-Appellees to reach their intended audience. Specifically, unrebutted testimony during the Preliminary Injunction hearing demonstrated that Plaintiffs-Appellees message was directed at international travelers arriving into the United States (and that it would only be effective if it were delivered immediately upon the international travelers' arrival). Aplt. Appx., p. 223 ("[Mr. McNulty]: What was the audience you were trying to reach with your message? [Eric Verlo]: We were trying to reach people who would be coming out of international arrivals and the people who were waiting for loved ones to come out[.]"); Aplt. Appx., p. 177 ("[Mr. McNulty]: Why did you go there? [Dr. Nazli McDonnell]: Because that's where the families would be gathering. I had seen on the news that, you know, there were many people awaiting their family members

who were detained at the border, or maybe not allowed to board the international flights they were destined to be in, and these distressed families were there. There were a number of immigrants arriving from backgrounds that may be – you know, may be Muslim, a lot of European flights coming in with connection from Muslim countries or maybe affected countries, so I felt that that's where I need to be to express my message."). Plaintiffs-Appellees testified that it would be impossible to determine another location to reach the, inevitably, diverse travelers arriving at DIA from international destinations, particularly those travelling from Muslim-majority countries effected by President Trump's Travel Ban. *Id.*, p. 223. The District Court did not commit clear error by considering in its calculus the fact that Plaintiffs-Appellees could only reach their intended audience (and therefore convey their message) at DIA, the only airport in the state of Colorado with international flights servicing the countries affected by President Trump's Travel Ban.

> 6.2(c) *The District Court properly determined the practicability of shortening Regulation 50's advance notice requirement when determining the reasonableness of Regulation 50.*

Defendants-Appellants wrongly state that reasonableness is limited to determining whether Regulation 50's permitting requirement is reasonably related to the airport's mission of facilitating the safe and secure movement of air passengers. This is directly refuted by *Lee*. While Plaintiffs-Appellees do not

contest that the stated purpose of DIA is to facilitate air travel, DIA obviously has come to have more purposes. *See Lee*, 505 U.S. at 687 (O'Connor, J., concurring) (noting that, with regards to the purposes of a particular forum, courts are to look not simply at the government's assertions of purpose, but also at the facility's actual operation). DIA is similar to the commercial multipurpose forum considered by the Court in *Lee* and its "numerous commercial adjuncts indicate that [DIA] has intentionally devoted the facility to considerable commercial activity supportive of but essentially independent of the primary purpose." *Multimedia Publ'g Co. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154, 163 (4th Cir. 1993). The Supreme Court has recognized that airports, like DIA, are large, multipurpose facilities. *See Lee*, 505 U.S. at 687 (O'Connor, J., concurring); Aplt. Appx., p. 330. Like in *Lee*, the wide range of activities promoted by DIA "is no more directly related to facilitating air travel than are the types of activities in which" Plaintiffs-Appellees wish to engage. *Id.* at 688-89; *see also Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569, 576 (1987) ("The line between airport-related speech and nonairport-related speech is, at best, murky"). The reasonableness inquiry in this case is, therefore, "not whether the restrictions on speech are 'consistent with . . . preserving the property' for air travel, but whether they are reasonably related to maintaining the multipurpose environment that" DIA has deliberately created. *Id.* at 689 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 406 U.S. 37,

50-51 (1983)). The District Court was not in error to determine the restrictions that Defendants-Appellants placed on speech at another multipurpose forum, a street parade, in assessing the reasonableness of Regulation 50. The multi-purpose nature of DIA weakens the justification for the unreasonable restrictions of Regulation 50. *See, e.g.*, *Jews for Jesus v. Mass. Bay Transp. Auth.*, 984 F.2d 1319, 1325 (1st Cir. 1993).

The District Court also correctly assessed reasonableness in light of the purpose of DIA and all "surrounding circumstances." 505 U.S. at 687 (O'Connor, J., concurring). It was certainly not clear legal error for the District Court to consider the ability of Defendants-Appellants to accommodate spontaneous expression at another forum where safety and security is of high concern as one of the "surrounding circumstances" involved in the reasonableness determination. *Id.* Street parades and large-scale events, as evidenced by recent demonstrations in Washington, D.C. and Berkley, California, carry with them enormous security concerns. Further, street parades certainly impede the passageway of travelers using the streets, whose main purpose is the passage of traffic.[6] The ability of

---

[6] The intended purpose of streets and sidewalks is the same as that of airports: facilitating the transportation of individuals (while streets and sidewalks aim to facilitate safe and efficient ground transportation, airports intend to facilitate safe and efficient air transportation). *See Lee*, 505 U.S. at 696-97 (Kennedy, J., concurring) ("It would seem apparent that the principal purpose of streets and sidewalks, like airports, is to facilitate transportation, not public discourse, and we

Defendants-Appellants to accommodate a street parade on twenty-four hours'

notice, given the similar governmental concerns surrounding the facilitation of a

street parade, would certainly be one of the "surrounding circumstances" the

District Court was permitted to consider in its reasonableness analysis. The District

Court, correctly, noted that a street parade requires significantly more security and

preparation than simply allowing a group of individuals to stand with signs in areas

already designed and designated for individuals with signs to stand (i.e. the areas

adjacent to both domestic and international arrivals at DIA). Aplt. Appx., pp. 146-

47.

Moreover, the District Court did not instruct Defendants-Appellants that

they had to allow Plaintiffs-Appellees unfettered access to DIA to protest. It simply

stated that a seven-day requirement was unreasonable, given multiple factors,

including the fact that it was clearly feasible (based on the testimony at the

Preliminary Injunction hearing) for Defendants-Appellants to accommodate protest

with 24-hours' notice, given the group wishing to protest has a specific need to

protest at the airport in an expedited manner and that the group applies for a

permit. Aplt. Appx., pp. 144-147, 158. Far from imposing a requirement that

have recognized as much. Similarly, the purpose for the creation of public parks
may be as much for beauty and open space as for discourse.") (citation omitted).

Plaintiffs-Appellees be granted unfettered access to DIA, the District Court rightly determined that a permitting requirement that completely foreclosed spontaneous expression, and that was not based on Defendants-Appellants inability (consistent with the multipurpose forum of DIA) to accommodate such protest, was not reasonable. This is not clear error.

### 6.2(d) *Defendants-Appellants do not have an informal policy of expediting permits.*

Regulation 50 explicitly states that *all* permits for expressive activity must be applied for seven days in advance. It contains no provision that allows for expedited permitting. Plaintiffs-Appellees challenged the facial validity of Regulation 50's permitting requirement and the District Court enjoined portions of Regulation 50 on its face.

Defendants-Appellants now argue that Regulation 50 does contain an expedited permitting process by way of an informal expedited permitting process. Not only does this cut against their other arguments that an expedited permitting process will, by its very existence, threaten passenger safety and interfere with the functioning of DIA, it is simply not true. There was testimony that on one occasion the permitting process had been expedited for a union. *Id.*, pp. 370-71. One instance does not evince an informal policy.

Even if Defendants-Appellants do have an informal policy of expediting permits, they still failed to provide an expedited permit to those who requested one prior to the January 28, 2017, protest. *Id.*, pp. 385, 386-87. And the individual in charge of issuing permits at DIA, David Dalton, testified at the Preliminary Injunction hearing that those applying to protest at DIA on January 28, 2017, would not have been granted an expedited permit to protest. *Id.* Therefore, the informal permitting process is clearly not available to all of those who apply. If anything, the discriminatory issuance of permits evinces that Defendants-Appellants' supposed informal expedited permitting process is viewpoint-based and, therefore, unconstitutional in and of itself.

> 6.2(e) *The District Court appropriately decided that it is reasonable for Regulation 50 to accommodate an applicant's preferred demonstration location.*

"Location, location, location. It is cherished by property owners and political demonstrators alike." *Pahls v. Thomas*, 718 F.3d 1210, 1216 (10th Cir. 2013). The District Court recognized this important principle in its Order. Aplt. Appx., pp. 147-48. The District Court's injunction is far from an abuse of discretion and tracks the reasonableness standard applied to restrictions on speech in a non-public forum. *See Lee*, 505 U.S. at 687-692 (O'Connor, J., concurring).

Contrary to Defendants-Appellants' assertions, the District Court did not allow Plaintiffs-Appellees unfettered discretion to choose their protest location.

Instead, the District Court simply limited Defendants-Appellants' discretion to the extent it was already limited when moving demonstrations that were already in place. Aplt. Appx., p. 147-148. The District Court first correctly noted that there is nothing in Regulation 50 limiting the discretion of DIA administrators to choose the location of permitted First Amendment activity; Regulation 50 allows administrators to limit protest locations based on any criteria they so choose, including a desire to suppress or dilute a particular message. *Id.* The District Court rightly determined that such unfettered discretion was unreasonable and ordered that the limitation contained in Regulation 50.04-6, which states that "[t]he CEO may move expressive activity from one location to another and/or disperse such activity around the airport upon reasonable notice to each affected person when in the judgment of the CEO such action is necessary for the efficient and effective operation of the transportation function of the airport[,]" now applies to the initial determination of the appropriate locations for permitted protests. *Id.* Limiting Defendants-Appellants discretion in the initial determination of an appropriate protest location to the same standard that Defendants-Appellants themselves have already outlined for the moving of an already-in-progress permitted protest, which DIA officials have presumably deemed to be reasonable and appropriate for the safe and efficient operation of DIA, will not threaten the safety or security of DIA.

Nothing in the District Court's Order prohibits Defendants-Appellants from limiting the locations for expressive activity at DIA. The District Court does not require that airport administrators allow Plaintiffs-Appellees to speak in whatever location they wish or grant airport administrators no discretion in designating where Plaintiffs-Appellees may speak within the Jeppesen Terminal. The District Court's Order simply states that Defendants-Appellants "must make all *reasonable* efforts to accommodate the applicant's preferred location, whether inside or outside of the Jeppesen Terminal." *Id.*, pp. 158-159 (emphasis added). This tracks the reasonableness standard employed in nonpublic fora and does not prevent Defendants-Appellants from only permitting Plaintiffs-Appellees to picket in areas that do not compromise the safety and passage of airport patrons. The District Court's Order simply requires Defendants-Appellants to not categorically deny Plaintiffs-Appellees request to protest in a particular location on an unconstitutional basis (particularly, a location that is necessary for Plaintiffs-Appellees to reach their target audience).

It also is important for this Court to consider the District Court's injunction regarding the location of Plaintiffs-Appellees' protest in context. At the Preliminary Injunction hearing, Defendant-Appellants argued in favor of diverting *all* protests to *outside* of the terminal in the area underneath the Westin Hotel, where only a very small fraction of passengers would encounter them and likely no

immigrants exiting from Customs. Under Regulation 50.04-1, DIA was given

discretion to do just that. Clearly, restricting all protest activities to an area *outside*

of the terminal is unreasonable. *See Jews for Jesus*, 482 U.S. at 575 ("[I]t is

obvious that such a ban [on all First Amendment activity within the terminal]

cannot be justified even if LAX were a nonpublic forum because no conceivable

governmental interest would justify such an absolute prohibition of speech."); *Lee*

*v. International Society of Krishna Consciousness, Inc.*, 505 U.S. 830 (1992) (per

curiam) (holding ban on leafleting within a terminal, even when leafleting was

allowed on the public areas outside of the terminal, unconstitutional); *Springfield v.*

*San Diego Unified Port Dist.*, 950 F. Supp. 1482 (S.D. Cal. 1996) (holding that

regulation establishing First Amendment zones *outside* of the terminal, but banning

First Amendment activity inside the terminal without a permit, was

unconstitutional). It was not an abuse of the District Court's discretion to enjoin

Defendants-Appellants, through the least restrictive means possible, from wholly

restricting Plaintiffs-Appellees protest activities to outside the Terminal, by

limiting Regulation 50.04-1 to the same standard as Regulation 50.04-6.[7]

---

[7] While some airports have designated locations within the airport for protests, *see ISKCON Miami, Inc. v. Metropolitan Dade County*, 147 F.3d 1282, 1290 (11th Cir. 1998) (finding that a total of eight "First Amendment zones" disbursed throughout the airport that were "placed. . . adjacent to the flow of passenger traffic" was reasonable); *Stanton v. Fort-Wayne-Allen Cty.*, 834 F. Supp. 2d 865, 873-74 (N.D. Ind. 2011) (finding that allowing protestors to request, through the permit application, areas to protest was reasonable), that is not the case at DIA.

Moreover, the District Court did not abuse its discretion in recognizing that individual choice of both communicative aspects, message and location, is critical to First Amendment expression. In fact, the Supreme Court has repeatedly recognized this principle, making clear that "the First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it." *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 790-91 (1988); *McCullen*, 134 S.Ct. at 2535-36; *Schneider,* 308 U.S. at 163. It is therefore the "general rule" that "the speaker has the right to tailor the speech." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 573 (1995); *see also Cohen v. California*, 403 U.S. 15, 25 (1971) ("It is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual."); *see also Edwards*, 262 F.3d at 866. The District Court did not abuse its discretion in weighing the importance of the location of Plaintiffs-Appellees' protest in the reasonableness assessment. That it determined giving absolute discretion to

Regulation 50 simply requires permit applicants to specify "each location at which the [expressive] activity is proposed to be conducted," Regulation 50.04-1, but does not delineate any limitation on the DIA administrator's discretion whether to approve the location request. To make "all reasonable efforts to accommodate the applicant's preferred location" is no different from ascertaining the reasonableness of the applicant's preferred location—the Airport can and should consider "the appropriate location for a group of the requested size in light of the day(s) and time(s) requested" and "the nature of the expressive activity, which can inform whether additional security is needed." Aplt. Appx., p. 141.

Defendants-Appellants to restrict the location of Plaintiffs-Appellees' protest, particularly considering Plaintiffs-Appellees' intended audience and Defendants-Appellants' implications that they planned to limit Plaintiffs-Appellees' protest to an area outside of the Terminal, was not clear error.

Again, Defendants-Appellants attempt to argue that DIA is not a multi-purpose forum, like the one considered by the Court in *Lee*, and instead that its only purpose is to facilitate air travel. This is simply not true and it is an important distinction for this Court to consider. Given the multiple purposes of DIA, it is reasonable that the District Court referenced public forum cases in finding that Plaintiffs-Appellees could not be restricted to areas of the Jeppesen Terminal (or, as Defendants-Appellants argued for at the Preliminary Injunction hearing, restricted to areas *outside* the Jeppesen Terminal) where their picketing would not be seen by their intended audience. The District Court's reference of these cases for a well-established principle of First Amendment jurisprudence does not, however, mean that the District Court analyzed this provision of Regulation 50 under the public forum analysis; to the contrary, it explicitly employed the reasonableness standard in determining that Defendants-Appellants "must make all reasonable efforts to accommodate the applicant's preferred location, whether inside or outside of the Jeppesen Terminal [so long as a permit applicant seeks to

demonstrate in a location where the unticketed public is normally allowed to be]." Aplt. Appx., pp. 158-159. This does not constitute an abuse of discretion.

Finally, the testimony of DIA administrators at the Preliminary Injunction hearing stated, unrebutted, that no passenger had been obstructed at the January 28, 2017, protest and that no unlawful activity whatsoever had occurred during that protest. *Id.*, pp. 340, 356. Accounts of that protest at the preliminary injunction hearing estimated attendance close to one thousand people. *Id.*, p. 264. Given that approximately one thousand could chant, march, and utilize amplification equipment in the heart of the Jeppesen Terminal, which was their preferred protest location, without causing a disruption, impeding passengers, or threatening safety in any way, it was not an abuse of discretion for the District Court to determine that it was unreasonable for Defendants-Appellants to not take into account Plaintiffs-Appellees preferred protest location when issuing permits.

6.3 <u>The District Court rightly concluded that the remaining elements necessary for the issuance of a preliminary injunction weighed in Plaintiffs' favor.</u>

6.3(a) *The District Court unerringly adjudged that Plaintiffs-Appellees are irreparably harmed absent an injunction.*

It is an undebatable truth in First Amendment jurisprudence that, no matter the forum, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347,

373 (1976); *see also Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016); *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) ("[W]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). Defendants-Appellants state, with scant citation to authority, that the violation of First Amendment rights is less important when it occurs at a non-public forum. This argument should be given no credence by this Court.

In support of their argument, Defendants-Appellants cite to multiple cases where the Court found that the plaintiff had *not* shown that she or he was likely to succeed on the merits of her or his First Amendment claim. These cases certainly do not support the contention that when the plaintiff has shown that she is likely to succeed on her First Amendment claim (as Plaintiffs-Appellees have in this case), but the violation of this sacredly held constitutional right occurred at a nonpublic forum, the plaintiff has somehow failed to show irreparable harm. The irreparable harm inquiry is not a weighing and balancing of the plaintiff's interests against the defendant's interests; it is a determination as to whether the plaintiff would be irreparably harmed absent an injunction. The violation of First Amendment rights, no matter the forum, constitutes irreparable harm. *See Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002) (holding that plaintiff had shown irreparable harm by demonstrating that he was likely to prevail on his claim

that his First Amendment rights had been violated at a nonpublic forum);

*Wickersham v. City of Columbia*, 371 F. Supp. 2d 1061, 1075 (W.D. Mo. 2005)

(same).

Adding to Plaintiffs-Appellees' harm in this matter is the fact that Plaintiffs-Appellees' expression was, and will be (should President Trump's Travel Ban be reinstated by the Supreme Court, which will occur with little notice), a time-sensitive response to a nearly unprecedented action by our federal government. *But see* C. Norwood, *A Twitter Tribute to Holocaust Victims*, THE ATLANTIC (January 27, 2017), https://www.theatlantic.com/politics/archive/2017/01/jewish-refugees-in-the-us/514742/ (describing the rebuff of refugees fleeing Nazi Germany in 1939, many of whom would be murdered during the Holocaust); *Korematsu v. United States*, 323 U.S. 214 (1944). Foreclosing Plaintiffs-Appellees' spontaneous protest, and discouraging Plaintiffs-Appellees and others from demonstrating, forecloses Plaintiffs-Appellees message and projects to the country that Denver is not like other cities of all sizes across the country that mustered sizeable protests at their airports.

The District Court determined that Plaintiffs-Appellees were likely to succeed on the merits of their First Amendment claim. Given this determination, the District Court did not err in finding that the violation of Plaintiffs-Appellees' First Amendment rights constituted irreparable harm.

6.3(b) *The District Court properly weighed Plaintiffs-Appellees'*
*interests against Defendants'.*

"The balance of equities… generally favors the constitutionally-protected freedom of expression." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) *overruled on other grounds by Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (8th Cir. 2012). Courts have consistently held that when First Amendment freedoms are threatened, the balance of the equities weighs in the plaintiff's favor. *See Verlo*, 820 F.3d at 1127; *Awad*, 670 F.3d at 1132; *ACLU v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999). The District Court did not abuse its discretion by following this well-established legal principle; after holding that Plaintiffs-Appellees were likely to succeed on the merits of their First Amendment claim, the District Court correctly determined that the balance of equities favored issuing an injunction.

Moreover, even if the District Court had been required to consider every equity outlined by Defendants-Appellants after determining that Plaintiffs-Appellees had shown a likelihood of success on the merits of their First Amendment claim, which it did not based on Tenth Circuit precedent stating the violation of First Amendment rights generally outweighs other considerations, it is clear that the equities weigh in Plaintiffs-Appellees' favor. Plaintiffs-Appellees do not contest Defendants-Appellants' assertions that security at DIA and the ability

of passengers to move, unobstructed, to their flights are critically important concerns. However, nothing in the evidentiary record, nor in Defendants-Appellants' arguments, suggests that picketing that is reasonably controlled by the portions of Regulation 50 that have not been enjoined would significantly, if at all, interfere with the multiple purposes of DIA. The picketing that Plaintiffs-Appellees wish to engage in is less disruptive of passenger sensibilities, physical movement, and security than the assertive leafleting activities the *Lee* court held could not be banned at La Guardia, John F. Kennedy, and Newark International airports (leafletting requires that individuals stop and take a flyer while passing through the airport whereas picketing requires no interaction between the picketer and the passerby). 505 U.S. at 690-93 (O'Connor, J., concurring); *Lee*, 505 U.S. at 830 (decided the same day as *Lee* and striking down a prohibition on the distribution of leaflets and other literature at New York Port Authority airports) (per curiam).

Further, Defendants-Appellants had the opportunity to present *evidence* at the Hearing about any *actual* threats to both security and passageway through the airport by Plaintiffs-Appellees yet they could only produce conjecture, even after a large-scale protest (wherein individuals were not only picketing, they were also singing and chanting, utilizing sound amplification equipment, and marching throughout the terminal). *See* Aplt. Appx., p. 331-32, 340, 356, 366. Defendants-Appellants adduced no evidence that security or passageway had been

compromised at DIA during the January 28, 2017, protest; likely, this is because no passenger had, in fact, missed his or her flight on account of the protest and no disorderly conduct had occurred.

Moreover, Plaintiffs-Appellees, and other peaceful protesters like them, do not wish to destroy the amenities, threaten the safety and security, or impair the commercial viability of DIA. Aplt. Appx., pp. 177-78, 261. And even with the District Court's injunction in place, there is still an advance notice requirement, allowing DIA to prepare for First Amendment activities and to determine the approximate number of individuals who will be present in the terminal, along with the individual or organization that will be organizing the potential protest. DIA is not prevented by the District Court's Order from ensuring the secure and efficient operation of DIA.

Furthermore, even with the District Court's limited injunction, Regulation 50 still contains myriad other regulations that prevent (and criminalize) all of the evils that would compromise order and efficiency at DIA. For example, the District Court did not enjoin the portions of the regulations that prevent anyone engaging in First Amendment activity from "[d]isrupt[ing] or interfere[ing] with the free and orderly flow of pedestrian or vehicular traffic[,]" which is prohibited by Regulation 50.08-4, and "[i]ntentionally grab[bing], restrain[ing], or in any way

intimidate[ing] any person[,]" which is prohibited by Regulation 50.08-1. *Id.*, pp.

496-97. If any person is threatening the security of DIA, they are subject to arrest.

Defendants-Appellants essentially ask this Court to reweigh and rebalance

the harms, which is improper under the abuse of discretion standard. *See Sanders*

*v. Mountain Am. Credit Union*, 621 F. App'x. 520, 527 (10th Cir. 2015) ("In

essence, the [appellants] ask us to reweigh the equities, but that is not our role

under the abuse-of-discretion standard of review."). This Court should dispose of

this portion of Defendants-Appellants' argument without reweighing the equities,

which the District Court has already weighed, in this matter.

Ultimately, Plaintiffs-Appellees have demonstrated that Regulation 50

violates their First Amendment rights. When the violation of First Amendment

rights is shown, the balance of equities favors issuance of an injunction. *See Awad*,

670 F.3d at 1131*; Johnson*, 194 F.3d at 1163.The District Court did not abuse its

discretion by following this well-established legal principle, after holding that

Plaintiffs-Appellees were likely to succeed on the merits of their First Amendment

claim, and determining that the balance of equities favored issuing an injunction.

> 6.3(c) *The District Court correctly determined that the public interest*
> *is served by protecting First Amendment rights.*

While it is in the public interest to enforce regulations in a manner that

complies with the constitution, even the public's interest in such enforcement must

give way to the "more profound and long-term interest in upholding an individual's constitutional rights." *Awad*, 670 F.3d at 1132. When the government activity that is to be enjoined violates an individual's First Amendment rights, as is the case here, there is an even stronger presumption that the injunction is in the public interest. *See Cate v. Oldham*, 707 F.2d 1176, 1190 (10th Cir. 1983) (noting "[t]he strong public interest in protecting First Amendment values"). Simply put, the public interest is not served by the government violating an individual's First Amendment rights. *See Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005) ("Vindicating First Amendment freedoms is clearly in the public interest.").

Plaintiffs-Appellees also do not contest that the public interest is served by safe, efficient, and secure operation of DIA. There is nothing about allowing Plaintiffs-Appellees to protest with a permit in a timely manner within the terminal, however, that threatens efficiency, safety, or security. In fact, during the January 28 and 29 protests there were no individuals who were obstructed, no person missed their flight, and no activity that threatened the safety and security of DIA occurred; every witness put on the stand by Defendants-Appellants at the Preliminary Injunction hearing testified as much. Aplt. Appx., p. 356 ([Mr. McNulty]: So from your testimony, it seems like you had a lot of concerns about the protests on January 28th and January 29th; is that right? [Patrick Heck]: I had

concerns about it, correct. [Mr. McNulty]: But there were no problems, right? [Mr. Heck]: Nothing that I was made aware of at the time.); Aplt. Appx., p. 340 ([Mr. McNulty]: Well, no one destroyed any property during the protest, right? [Kenric Greene]: Not to my knowledge. // [Mr. McNulty]: [Y]ou're not aware of a single passenger that missed a flight, right? [Mr. Greene]: I'm not aware of a passenger missing a flight. [Mr. McNulty]: Or being delayed, right? [Mr. Greene]: I'm not aware of a passenger being delayed.). DIA administrators testified that those holding signs do not compromise airport security any more than a member of the general public, who is free to enter DIA. Aplt. Appx. 366 (Q: [Mr. McNulty] Now, you had said earlier that the Jeppesen Terminal is open to the public, right? [Patrick Heck]: That's correct. [Mr. McNulty]: And do you have any evidence that a person holding a sign is more dangerous than another person just walking into the terminal? [Mr. Heck]: I certainly don't.); Aplt. Appx., 331-32. Simply put, Plaintiffs-Appellees do not wish to disrupt the order and efficiency of DIA by protesting; they simply wish to peacefully communicate their message.

Moreover, the portions of Regulation 50 that have not been enjoined contain a number of other restrictions that prevent (and criminalize) all of the evils Defendants-Appellants speculate about that could compromise efficiency and safety at DIA. At the Preliminary Injunction hearing, DIA administrators testified that any problems with obstruction or disruption are remedied by Regulation 50.08.

Aplt. Appx., p. 390-91 ( [Mr. McNulty]: Now, any problems that would be related with this speech that you say would cause obstruction or disruption are already covered by 50.08, right? [David Dalton]: Right. // [Mr. McNulty]: And it outlaws interfering with the orderly flow of pedestrian traffic, for example, right? [Mr. Dalton]: Yes. // [Mr. McNulty]: So I'm asking you, even if the permitting process were scrapped, let's say, poof, it's gone, none of the conduct that you said would be a problem without the permits could occur because 50.08 already covers it. [Mr. Dalton]: Right.). If any person is threatening the security of DIA (or obstructing a passenger), they are subject to arrest under criminal penalties. Aplt. Appx., p. 422 ( [Mr. McNulty]: So let's say there was a protester there who was obstructing another passenger. They would be guilty of obstruction, right? [Commander Antonio Lopez]: They would be guilty of – if they were intentionally preventing someone from walking past them and blocking their path, and it had been a disturbance of the peace, it could be a number of things, depending on what the relationship is between the individual – between the two individuals.). The portions of Regulation 50 that the District Court enjoined are over-inclusive, which shows both their unreasonableness and that there is no threat of harm to Defendants-Appellants absent their enforcement. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 826 (9th Cir. 2013) (citation omitted) (finding that there is a "longstanding rule that, because restricting speech should be the government's tool of last resort, the

availability of obvious less-restrictive alternatives renders a speech restriction overinclusive.").

Finally, the public's interest in protecting the guarantees of the First Amendment outweighs any alleged efficiency, safety or security issues Defendants-Appellants contend are presented by Plaintiffs-Appellees' protest. The Fourth Circuit said it best when it stated

> while it is tempting to hold that First Amendment rights should acquiesce to national security in this instance, our Forefather Benjamin Franklin warned against such a temptation by opining that those "who can give up essential liberty to obtain a little temporary safety, deserve neither liberty nor safety." We take heed of his warning and are therefore unwilling to relinquish our First Amendment protections—even in an airport.

*Tobey*, 706 F.3d at 393; *see also Massachusetts Bay Transp. Auth.*, 984 F.2d at 1324-25 (striking down a ban on leafletting in subway system and stating that "the Supreme Court [in *Lee*] has dismissed the danger to traffic congestion as a justification to ban leafletting"). Plaintiffs-Appellees ask this Court to follow Benjamin Franklin's maxim and not allow conjectural concerns about safety and security to trump our most sacred constitutional liberties.

6.4 <u>The District Court properly exercised its discretion by narrowly construing Regulation 50.</u>

Far from rewriting Regulation 50, in its order, the District Court appropriately applied a limiting construction to an ambiguous regulation, as has been done innumerable times by federal courts confronting unconstitutional laws that can be redeemed by a narrowing construction. *See e.g., Brockett v. Spokan Arcades,* 472 U.S. 491, 504-505 (1985) (invalidating obscenity statute only to the extent that word "lust" was actually or effectively excised from statute); *United States* v. *Grace,* 461 U.S. 171, 180-183 (1983) (invalidating federal statute banning expressive displays only insofar as it extended to public sidewalks when clear line could be drawn between sidewalks and other grounds that comported with congressional purpose of protecting the building, grounds, and people therein). There was testimony below from DIA officials that, in the past, permits had been issued on an expedited basis even though not explicitly mentioned in Regulation 50. Aplt. Appx., pp. 370-71. By definitively stating that expedited permits must be issued with twenty-four hours' notice under Regulation 50, pursuant to a few conditions, the Court narrowly construed Regulation 50 in a way that would save it from being struck down in its entirety as unconstitutional. *See e.g. Buckley v. Valeo*, 424 U.S. 1 (1976) (upholding a reporting provision applicable to any person making an independent expenditure in excess of $100 based on a narrowing construction that the statute only applied to "express advocacy"); *Dombrowski v. Pfister*, 380 U.S. 479 (1965) (finding that a state statute should not be deemed

facially invalid unless it is not readily subject to a narrowing construction). This does not constitute an abuse of discretion.

Throughout our nation's history, federal courts have rightly substituted their judgment for that of public officials whose judgment infringes on constitutionally-protected rights. *See Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954). In fact, that is the very purpose of judicial review – to substitute the judgment of the courts for the judgment of other public officials in determining the constitutionality of official action, regulation, and legislation. *See Marbury v. Madison*, 5 U.S. 137 (1803). The District Court's exercise of its authority to judicially review Regulation 50 is not an abuse of discretion.

Finally, Defendants-Appellants' argument that complying with the preliminary injunction would "impose a substantial burden[,]" App. Brief, p. 44, is no basis for determining that the District Court abused its discretion. "The First Amendment is often inconvenient. But that is beside the point. Inconvenience does not absolve the government of its obligation to tolerate speech." *Lee*, 505 U.S. at 701 (Kennedy, J., concurring); *see also First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*, 308 F.3d 1114, 1129 (10th Cir. 2002). Simply because Defendants-Appellants may encounter some speculative difficulty in implementing the District Court's Order does not mean the District Court abused its discretion.

6.5 <u>The District Court only addressed issues raised by Plaintiffs-Appellees in their Complaint and Motion for Preliminary Injunction.</u>

Plaintiffs-Appellees challenge the entirety of Regulation 50 in both their Complaint and the Motion for Preliminary Injunction as violative of their rights under the First and Fourteenth Amendments. Aplt. Appx., pp. 9-45. The constitutionality of the entirety of Regulation 50, therefore, was submitted for review by the District Court and the District Court did not commit clear error by enjoining portions of Regulation 50, including Regulation 50.09 and Regulation 50.08-12.

Further, Defendants-Appellants misstate, either purposefully or unintentionally, that Plaintiffs-Appellees never contested the validity of the picketing restriction within Regulation 50, Regulation 50.09, at the Preliminary Injunction hearing. Regulation 50.09 bans all "picketing" (which includes "displaying one or more signs, posters or similar devices," as defined in Regulation 50.02-8) within the Jeppesen Terminal. Counsel for Plaintiffs-Appellees specifically inquired of the individual charged with enforcing Regulation 50, Dave Dalton, whether Regulation 50.09 did, indeed, ban all displays of signs within the Jeppesen Terminal. Mr. Duncan responded in the affirmative, confirming the plain language of Regulation 50.09. Aplt. Appx., p. 386 (Q: [Mr. McNulty] Now, Regulation 50.09 says, Picketing not related to a labor dispute is prohibited in all interior areas of the terminal and concourses, in the restricted area, and in all vehicular roadways and shall not be conducted by more than two persons at any

one location upon the airport. Is that an accurate reading of Regulation 50.09? A: [Dave Dalton] Yes. Q: [Mr. McNulty] So that regulation says you can't hold a sign anywhere within the Jeppesen Terminal regardless of whether you have a permit, right? A: [Dave Dalton] Correct.). The District Court did not err by addressing the issues Plaintiffs-Appellees clearly raised.

6.5(a) *The District Court rightly determined that Regulation 50.09 is unreasonable.*

Regulation 50.09 bans all non-labor picketing within Jeppesen Terminal. The Supreme Court has unequivocally held that completely banning an unobtrusive form of expression from even nonpublic fora is unconstitutional. In *Jews for Jesus, Inc.,* the Supreme Court considered whether a resolution restricting free speech in the airport was constitutional. 482 U.S. at 569. The regulation stated that the airport "is not open for First Amendment activities by any individual and/or entity." *Id.* at 574. Although the Court did not explicitly find that the airport was a nonpublic forum, it did hold that the resolution restricting speech in the airport was facially unreasonable, even if the airport was a nonpublic forum. *Id.* at 573. The Court noted that enforcing the resolution would prohibit "talking and reading, or the wearing of campaign buttons or symbolic clothing." *Id.* at 574. The Court also noted, "[m]uch nondisruptive speech--such as the wearing of a T-shirt or button that contains a political message--may not be 'airport related' but is still protected speech even in a nonpublic forum." *Id.*at 575 (citing *Cohen v.*

*California,* 403 U.S. 15 (1971) (holding that wearing of jacket with offensive language in a courthouse was a form of nondisruptive expression that was protected by the First Amendment)); *see also Tobey*, 706 F.3d at 391. Thus, although specific conduct was not at issue in the *Jews for Jesus* decision, the Court nonetheless implicitly held that non-disruptive speech is protected by the First Amendment in nonpublic fora and that restrictions that encumber non-disruptive expression are unreasonable. In fact, Regulation 50.09 ostensibly bans the same conduct that the Supreme Court found in *Jews for Jesus* was protected speech even in the airport nonpublic forum: the wearing of political t-shirts and/or buttons.

In *Springfield*, the district court found an ordinance remarkably similar to Regulation 50 violated the First Amendment. 950 F. Supp. at 1484. The ordinance at issue prohibited individuals from:

> Conduct[ing] surveys or solicit information from the general public[;] Conduct[ing] or participat[ing] in any speech making and/or proselytizing[;] Conduct[ing] or participat[ing] in any parading, picketing, marching, patrolling, demonstrating and/or assembling; Carry[ing], display[ing] or caus[ing] to be displayed any signs or placards[;] Distribut[ing] any literature, pamphlets or other printed material[;] Seek[ing] petition signatures.

*Springfield*, 950 F. Supp. at 1484-85. The ordinance also only allowed "individuals or groups to engage in these prohibited activities only in a handful of 10' x 14' "Authorized Solicitation/Free Speech" zones located outside the terminals, and only after obtaining a permit[.]" *Id.* at 1485. The parallels between the ordinance at

issue in *Springfield* and the ban imposed by Regulation 50.09 in this case are clear.

The district court in *Springfield* ultimately held that, even though the airport was a

nonpublic forum, the ordinance at issue violated the First and Fourteenth

Amendments. Specifically, with the prohibition on display of signs, the Court

found that the ordinance violated the First Amendment because

> Under public forum analysis, the ban -- even if limited, as the Port
> District now suggests, to "the act of carrying or displaying signs
> which are unrelated to Airport business" (Def. Opposition Brf., at 21)
> -- is not "reasonably related to maintaining the multipurpose
> environment that the Port [District] has deliberately created."
> *ISKCON*, 505 U.S. at 689 (O'Connor, J., concurring). The regulation
> is not limited to large signs or to signs that obstruct pedestrian traffic
> or interfere with Airport employees' work; if it were, it would be
> redundant of §§ 5.15(f) and (g) of the Port District Code. Instead, the
> ban covers all signs, even those that have no effect on the Airport's
> congestion problems. Like the leafletting protected in *ISKCON*, the
> display of a small, unobtrusive sign "does not entail the same kinds of
> problems presented by face-to-face solicitation.

*Id.* at 1489-90. The same reasoning applies to Regulation 50.09's ban of picketing.

Finally, in *Lee*, at issue was whether individuals could solicit for donations

and distribute leaflets in an airport. Justice O'Connor distinguished between

solicitations and distributing leaflets when she wrote:

> [Leafleting does not entail the same kinds of problems presented by
> face-to-face solicitation. Specifically, 'one need not ponder the
> contents of a leaflet or pamphlet in order mechanically to take it out of
> someone's hand . . . . The distribution of literature does not require
> that the recipient stop in order to receive the message the speaker

wishes to convey; instead the recipient is free to read the message at a later time.'

*Lee*, 505 U.S. at 690 (O'Connor, J., concurring) (quoting *United States v. Kokinda*, 497 U.S. 720, 734 (1990)). The Court ultimately held

in *Lee* that prohibiting solicitation in a nonpublic fora is reasonable, but that

prohibiting the distribution of leaflets and other literature is unreasonable.

Picketing is analogous to leafleting; a person does not need to stop in order to read

a sign as she or he walks past. The District Court correctly came to this conclusion

in enjoining Regulation 50.09. Aplt. Appx., p. 148-149. Its conclusion was not a

clearly erroneous application of the law.

> 6.5(b) *The District Court rightly determined that Regulation 50.08-12 is unreasonable.*

The District Court did not abuse its discretion by enjoining Regulation

50.08-12's limitation of all signs to one square foot. The District Court relied upon

the holding and language of Justice O'Connor's concurrence in *Lee*. 505 U.S. at

690-93 (O'Connor, J., concurring). Correctly, the District Court determined that

holding signs of greater than one square foot is even less intrusive than leafleting

and that, therefore, banning all signs over one square foot was unreasonable. Aplt.

Appx., pp. 148-49.

Defendants-Appellants' arguments that the District Court had no evidence

upon which to base its decision is simply incorrect. There are numerous pictures

within the record illustrating that large signs have been accommodated without issue in the past within the Jeppesen Terminal. Aplt. Appx., pp. 500-510. Furthermore, it was not legal error for the District Court to conclude that limiting signs to one foot by one foot is akin to outright banning all signs as, based on common sense, the message on a sign that is one foot by one foot is indecipherable. Justice O'Connor's concurrence in *Lee* (along with the companion per curiam opinion and the Supreme Court's decision in *Jews for Jesus*) stands for the proposition that non-disruptive speech cannot be banned within the airport. *Lee*, 505 U.S. at 690 (O'Connor, J., concurring); *Jews for Jesus*, 482 U.S. at 575; *Lee*, 505 U.S. at 830 (per curiam). The one foot by one foot sign restriction imposes a de facto ban on picketing. The District Court properly recognized this in its Order and enjoining Regulation 50.08-12 was not an abuse of the District Court's discretion.

7. **Conclusion**

As Dr. McDonnell so eloquently stated at the Preliminary Injunction hearing,

> The seven-day rule and the absence of any expedited process means that the citizens are not allowed to respond in a timely manner and express their opinion. If I wanted to live in a country where there was no First Amendment, I would go back to my home to Turkey and be arrested for talking.

Aplt. Appx., p. 193. Plaintiffs-Appellees ask that this Court allow Plaintiffs-Appellees to speak and affirm the District Court's Order.

## 8. Statement Regarding Oral Argument

Given the complexities of the First Amendment issues in this case and that Plaintiffs-Appellees' speech involves a matter of great public concern, Plaintiffs-Appellees believe oral argument would assist the Court in resolving the issues on appeal.

DATED this 7th day of June 2017.

Respectfully submitted,

*s/ Andy McNulty*
David A. Lane
Mari Newman
Andy McNulty
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
dlane@kln-law.com
mnewman@kln-law.com
amcnulty@kln-law.com

*Counsel for Plaintiffs-Appellees*

<u>**CERTIFICATE OF COMPLIANCE**</u>

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,777 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Local Rule 32.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

Dated: June 7, 2017

KILLMER, LANE & NEWMAN, LLP

*s/ Andrew McNulty*
David A. Lane
Mari Newman
Andrew McNulty
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
dlane@kln-law.com
mnewman@kln-law.com
amcnulty@kln-law.com
*Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF SERVICE

I hereby certify that a copy of this **PLAINTIFFS-APPELLEES'
RESPONSE BRIEF** was served on June 7, 2017, via CM/ECF to the
following:

Wendy Shea, Assistant City Attorney
Writer Mott, Assistant City Attorney
Kristen J. Crawford, Assistant City Attorney
Denver City Attorney's Office
Litigation Section
201 W. Colfax Avenue, Dept. 1108
Denver, CO 80202
(720) 913-3100
Wendy.shea@denvergov.org
Writer.mott@denvergov.org
Kristen.crawford@flydenver.gov

*s/ Jamie Akard*
Jamie Akard

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)    All required privacy redactions have been made;

(2)    If required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3)    The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, McAfee, Version 4.8.0.1500 updated on June 7, 2017 and according to the program are free of viruses.

KILLMER, LANE & NEWMAN, LLP

*s/ Jamie Akard*
Jamie Akard